2015 IL App (1st) 142473

FIRST DIVISION
September 21, 2015

No. 1-14-2473

| | | |
|---|---|---|
| PEKIN INSURANCE COMPANY, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| CSR ROOFING CONTRACTORS, INC., | ) | No. 13 CH 16877 |
| | ) | |
| Defendant-Appellant | ) | |
| | ) | |
| (Jordan Lake and Michelle Lake, | ) | Honorable |
| | ) | Kathleen M. Pantle, |
| Defendants). | ) | Judge Presiding. |

PRESIDING JUSTICE LIU delivered the judgment of the court, with opinion.
Justices Simon and Neville concurred in the judgment and opinion.

**OPINION**

¶ 1     This dispute presents a question of whether an insurer has a duty to defend an additional insured under the terms of a commercial general liability policy that was issued to a third party. Plaintiff, Pekin Insurance Company (Pekin), filed suit against defendant, CSR Roofing Contractors, Inc. (CSR), seeking a declaration that it had no duty to defend CSR in a personal injury action brought by an employee of CSR's subcontractor, Zamastil Exteriors (Zamastil). CSR filed a counterclaim for declaratory judgment, claiming that Pekin owed a duty to defend CSR, as an additional insured, under a commercial general liability policy (CGL policy) issued to Zamastil. The parties filed cross-motions for judgment on the pleadings pursuant to section 2-615(e) of the Code of Civil Procedure (Code) (735 ILCS 5/2-615(e) (West 2012)). On July 16, 2014, the circuit court granted judgment to Pekin, finding that: (1) the additional insured

endorsement of the CGL policy was unambiguous and only covered bodily injury for which the additional insured was vicariously liable; and (2) Pekin owed no duty to defend CSR in the personal injury action.

¶ 2    On appeal, CSR contends that the court erred in finding the additional insured endorsement unambiguous where it conflicted with the insurance requirements of CSR's master subcontract agreement (MSA) with Zamastil. CSR also contends that the court erred in finding that Pekin owed no duty to defend it in the underlying lawsuit. For the following reasons, we reverse and remand with directions.

¶ 3                          BACKGROUND

¶ 4    CSR was the "general roofing contractor" for a project involving the removal and replacement of the roof on multi-unit commercial apartment buildings at 4515 Blackhawk Lane, Lisle, Illinois (the worksite). CSR subcontracted certain work on the project to Zamastil. On November 19, 2012, Jordan Lake fell off the roof of a building at the worksite and sustained serious injuries. At the time of the accident, Lake was an employee of Zamastil and had been working on the roofing project.

¶ 5                          A. The MSA

¶ 6    On March 5, 2012, CSR and Zamastil entered into the MSA, which required Zamastil to maintain certain minimum insurance coverage. As pertinent here, Zamastil was required to procure commercial general liability insurance on a "primary/non-contributory" basis and name CSR as an additional insured. The MSA expressly provided that Zamastil was required to obtain certain commercial general liability coverage in accordance with the following provision:

> "The policy shall include an endorsement naming [CSR], Owner, Owner's
>
> Representatives and Architect (and any other parties as may be reasonably

Required by Owner or Contractor) as Additional Insured's. <u>Coverage for the Additional Insured's must be primary/non-contributory and must include ongoing and completed operations coverage's (via ISO Forms CG2010 10/01 and CG2037 10/01 or their equivalent(s) as may be approved on writing by Contractor)—coverage must NOT be limited to vicarious liability.</u>" (Emphasis in original.)

¶ 7                                  B. The CGL Policy

¶ 8     Pekin issued a CGL policy (No. CL0162367-0) to Zamistil as the named insured for the policy period of September 13, 2012, to September 13, 2013. The CGL policy contained the following additional insured endorsement:

> "**1. Section II – Who Is An Insured** is amended to include as an insured any person or organization for whom you are performing operations, when you and such person or organization have agreed in a written contract effective during the policy period stated on the Declarations Page \*\*\* and executed prior to the 'bodily injury' or 'property damage' for which coverage is sought, that you must add that person or organization as an additional insured on a policy of liability insurance (hereinafter referred to as the 'Additional Insured').
>
> The Additional Insured is covered only with respect to vicarious liability for 'bodily injury' or 'property damage' imputed from You to the Additional Insured as a proximate result of your ongoing operations performed for that Additional Insured during the Policy Period."
>
>                                  \* \* \*

**3.** With respect to the coverage afforded to the Additional Insured, the following additional exclusions apply:

\* \* \*

**b.** Liability for 'bodily injury' or 'property damage' arising out of or in any way attributable to the claimed negligence or statutory violation of the Additional Insured, other than vicarious liability which is imputed to the Additional Insured solely by virtue of the acts or omissions of the Named Insured."

¶ 9                                   C. The Personal Injury Complaint

¶ 10    Lake and his wife filed a personal injury lawsuit against CSR on March 26, 2013. In their later-filed amended complaint, the Lakes alleged claims of negligence (count I), premises liability (count II), and loss of consortium (counts III and IV). Specifically, they alleged that CSR "contracted with a crane provider to lift and place roofing shingles on the roof [of a building] for [Lake] and [his] co-workers to install after completing the tear-off of the old roof." They asserted that CSR directed the shingles to be placed on a building that was not the intended building, but an adjoining one, and this misdirection required Lake to move the shingles from one roof to the other. As Lake was moving the shingles with a wheelbarrow, the "wheelbarrow got stuck and jammed on part of the roof causing [Lake] to fall off the roof onto the ground and concrete below."

¶ 11    According to the amended complaint, the MSA provided that "both CSR and Zamastil must comply entirely with all OSHA Federal regulations." One such Occupational Safety and Health Administration (OSHA) regulation required that workers "be properly and safely secured and/or 'tied off' with safety lines or other devices" when working at a height of more than eight

feet. At the time of the accident, Lake was working at a height of approximately 27 feet and "was not 'tied off' or secured in any way." Purportedly, CSR had actual knowledge that Jordan and other Zamastil workers on the roof "did not have the appropriate number of safety lines, safety harnesses, roof anchors and other safety devices that were necessary to safely perform the work." Additionally, CSR "had the authority to stop the work of its subcontractors when unsafe working conditions existed."

¶ 12    The Lakes further alleged that, as a proximate result of CSR's negligence, Lake suffered severe injuries and sustained permanent disabilities. With respect to CSR's negligence, the Lakes alleged that CSR:

"a. Violated required safety standards and practices in the industry;

b. Failed to comply with accepted safety standards and procedures in the industry;

c. Violated Defendant's own policies and procedures in allowing an unsafe condition;

d. Failed to comply with Defendant's own policies and procedures in allowing unsafe condition;

e. Failed to comply with OSHA safety regulations;

f. Failed to require its subcontractor to be competent as identified and defined by OSHA;

g. Allowed its subcontractors to not be competent in violation of OSHA regulations;

h. Failed to require the subcontractor Zamastil to comply with OSHA regulations;

i. Allowed roofers including the Plaintiff to work on the roof at approximately twenty-seven feet off of the ground without adequate safety equipment;

j. Placed shingles on the wrong roof which required manual movement from the roof of one building to another;

k. Directed the crane operator to place the shingles on the wrong roof;

l. Violated section 414 [of the Third Restatement of Torts (Restatement Second of Torts § 414 (1965))];

m. Failed to comply with section 414; and

n. Failed to stop the work when it had actual knowledge of unsafe working conditions."

¶ 13                    D. Tender of Defense and Declaratory Action

¶ 14    On May 24, 2013, CSR tendered its defense in the underlying personal injury suit to Pekin. Pekin, however, denied the tender and, on July 16, 2013, filed a declaratory judgment action, seeking a declaration that Pekin had no duty to defend CSR as an additional insured under the CGL policy. CSR then filed an amended counterclaim to which it attached a copy of the MSA. CSR and Pekin subsequently filed cross-motions for judgment on the pleadings.

¶ 15    CSR argued that Pekin incorporated the requirements of the MSA into the CGL policy by referring to a 'written contract' in the additional insured endorsement. According to CSR, an ambiguity exists between the MSA and the CGL policy because the language of the MSA states that "coverage must NOT be limited to vicarious liability," while the CGL additional insured endorsement states that "[t]he Additional Insured is covered only with respect to vicarious liability." CSR argued that this ambiguity "must be construed in favor of coverage for the

additional insured, CSR"; it also argued, alternatively, that Pekin has a duty to defend because the allegations in the personal injury complaint fell within the scope of the additional insured endorsement and, therefore, triggered the duty to defend.

¶ 16 Pekin argued that the court should not consider documents other than the CGL policy, and that the additional insured endorsement clearly and unambiguously limited coverage to vicarious liability. Pekin also argued that it had no duty to defend CSR where the personal injury action did not involve allegations of vicarious liability for actions or omissions of Zamastil.

¶ 17 On July 16, 2014, the circuit court granted judgment on the pleadings in favor of Pekin and denied CSR's motion. As pertinent here, the court found that the CGL policy did not incorporate the MSA because (1) the provisions of the policy conflicted with, rather than incorporated, those in the MSA, and (2) the policy did not involve the same contracting parties and was not executed at the same time as the MSA. The court determined that the CGL policy was "facially unambiguous" and declined to "look to the subcontract to create an ambiguity where one does not exist on the face of the policy."

¶ 18 Additionally, the court found that Pekin did not owe a duty to defend CSR in the underlying personal injury action. In doing so, the court reasoned that the allegations in the amended complaint supported only a theory of direct liability on the part of CSR. Concluding that "the underlying amended complaint does not even allege negligent acts or omissions by Zamastil," the court held that "[t]his alone defeats the theory of vicarious liability."

¶ 19 The court further found that "the allegations which CSR points to in order to show that it retained control over Zamastil are simply not enough to support the level of detail necessary for a finding that it may be vicariously liable for the negligence of Zamastil." Finally, the court found

*Pekin Insurance Co. v. Hallmark Homes, L.L.C.*, 392 Ill. App. 3d 589 (2009), cited by CSR, to be factually distinguishable from the case at bar.

¶ 20    CSR timely appealed from the circuit court's order. We have jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. May 30, 2008).

¶ 21                                ANALYSIS

¶ 22                         A. Standard of Review

¶ 23    Judgment on the pleadings is proper when no genuine issue of material fact is apparent from the pleadings and the moving party is entitled to judgment as a matter of law. *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 455 (2010). In resolving such a motion, all well-pleaded facts set forth in the pleadings of the nonmoving party are admitted along with any fair inferences drawn therefrom. *Id.* We review *de novo* whether the pleadings presented no issue of material fact and, if no such issue existed, whether judgment was proper. *Pekin Insurance Co. v. Allstate Insurance Co.*, 329 Ill. App. 3d 46, 49 (2002).

¶ 24                         B. Scope of Coverage

¶ 25    CSR contends that the circuit court erred in finding the additional insured endorsement unambiguous where it conflicted with the insurance requirements of the master subcontract agreement (MSA) with Zamastil. CSR maintains that the MSA must be considered when addressing the duty to defend, citing *Pekin Insurance Co. v. Pulte Home Corp.*, 404 Ill. App. 3d 336 (2010), and *Pekin Insurance Co. v. Equilon Enterprises LLC*, 2012 IL App (1st) 111529. According to CSR, "[t]here is nothing in either *Pulte* or *Equilon* that prevents this Court from construing the MSA and the policy together; indeed, those cases urge the opposite—that the MSA is directly relevant to Pekin's duty to defend and indeed must be construed together to determine the intent of all the parties, including Pekin's named insured Zamastil, and CSR,

Zamastil's business partner." Pekin responds that the circuit court properly declined to rely on the MSA when interpreting the unambiguous language of the CGL policy.

¶ 26 The primary objective in construing the language of an insurance policy is to ascertain and give effect to the intentions of the parties as expressed in their agreement. *American States Insurance Co. v. Koloms*, 177 Ill. 2d 473, 479 (1997). Where such language is clear and unambiguous, it must be given its plain and ordinary meaning. *Id.* If, however, the terms may have more than one meaning, then an ambiguity exists and it will be construed strictly against the insurer as the drafter. *Id.* As a general rule, we liberally interpret provisions that limit or exclude coverage in favor of the insured and against the insurer. *Id.* The construction of an insurance policy is a question of law; as such, our review is *de novo*. *Id.* at 479-80. On examination, we may "take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract." *Id.* at 479.

¶ 27 Here, the additional insured endorsement is clear and unambiguous. It states that "[t]he Additional Insured is covered only with respect to vicarious liability for 'bodily injury' or 'property damage' imputed from You [the named insured] to the Additional Insured as a proximate result of your ongoing operations performed for that Additional Insured during the Policy Period." It specifically excludes coverage for "[l]iability for 'bodily injury' or 'property damage' arising out of or in any way attributable to the claimed negligence or statutory violation of the Additional Insured, *other than vicarious liability* which is imputed to the Additional Insured solely by virtue of the acts or omissions of the Named Insured." (Emphasis added.) This language is susceptible to only one meaning—that CSR is entitled to coverage under the CGL policy if, at the time of the accident, Zamastil's acts or omissions occurred (1) as an agent of CSR and (2) within the scope of its authority as CSR's agent.

¶ 28 CSR maintains that "the court must consider both the policy language and the MSA in determining whether Pekin's policy is ambiguous as applied to the facts of this case." According to CSR, when the CGL policy and the MSA are compared, there is an ambiguity as to the scope of coverage with the MSA requiring that coverage not be limited to vicarious liability and the CGL policy, in fact, limiting coverage to vicarious liability. In support of its argument CSR relies on *Pulte* and *Equilon*. We find these cases inapposite.

¶ 29 In *Pulte*, the court addressed whether an insurer owed a duty to defend the additional insured under the terms of a policy that limited coverage to vicarious liability on the part of the named insured. *Pulte*, 404 Ill. App. 3d at 338-39. The parties did not raise any issue as to the scope of coverage afforded under the policy; the only question was whether the underlying complaint triggered the insurer's duty to defend. *Id.* at 339. Nothing in *Pulte* would support what CSR asks us to do here: that is, use a subcontract agreement to read an ambiguity into an insurance contract that is otherwise clear and unambiguous. CSR relies on one sentence in the *Pulte* opinion, where this court stated that "in order to construe the parties' intent in the instant case, we must look to the language of the subcontract agreement between Pulte Homes and Kunde Construction, as well as the insurance policy issued by Pekin to Kunde Construction." *Id.* at 343. This comment was made in the context of determining whether the insurer owed a duty to defend; it does not follow, however, that we may find ambiguity in an insurance policy whenever the policyholder is party to another agreement, *i.e.*, a subcontract, that requires more coverage than the scope defined by the policy's clear and unambiguous language.

¶ 30 In *Equilon*, this court found two additional insured endorsements in an insurance policy ambiguous when read together. *Equilon*, 2012 IL App (1st) 111529, ¶¶ 1, 34. The first endorsement stated that " '[t]he person or organization shown in the schedule [is an insured], but

only with respect to their liability as grantor of a franchise to you.' " *Id.* ¶ 7. The second endorsement stated that the additional insured was covered " 'only with respect to liability arising out of your operations and premises owned by or rented by you.' " *Id.* The insurer claimed that the additional insureds were covered only under the first endorsement for "actions alleging '[they] were negligent in granting a franchise.' " *Id.* ¶ 16. This court disagreed, finding that the insurer's argument "would render meaningless the coverage provided by the second endorsement." *Id.* ¶ 20. We stated that any ambiguities were to be construed in favor of the insured and then turned to the question of whether the insurer owed a duty to defend under the second additional insured endorsement. *Id.* ¶¶ 20, 23. In addressing the duty to defend, this court made the following comments, which are now cited by CSR:

> "In construing an insurance policy, Illinois courts look to 'the risk undertaken, the subject matter and the purpose of the contract.' [Citation.] It follows that a circuit court ought not ignore the agreements that serve to drive the named insured to purchase the liability policy naming the other party as an additional insured, in assessing the risk undertaken and the subject matter and purpose of the insurance contract. [Citation.] Here as well, we conclude that it was appropriate for the circuit court 'to examine evidence beyond that contained in the underlying complaint in determining the duty to defend.' [Citation.]" *Id.* ¶ 28.

Further, this court noted: "It seems likely that the contract that compels a named insured to add other parties to its liability policy will inform the circuit court's decision on the nature of the coverage the purchased policy was meant to provide to the additional insured." *Id.* ¶ 29. CSR latches on to our statement that, "were we to preclude the circuit court from considering the

11

agreements that compelled the additional-insured coverage, it may well spur litigation between the additional insured and the named insured over whether the contracted-for insurance was procured." *Id.* ¶ 30. Having made these comments in *Equilon*, we proceeded to consider the franchise agreements that triggered the named insured to procure the insurance policy in determining whether the insurer owed a duty to defend. *Id.* ¶ 31.

¶ 31    In relying on *Equilon*, CSR has taken our comments out of context. The comments to which CSR refers were made in the context of determining whether the insurer owed the insured a duty to defend under the second additional insured endorsement; they were not made in determining the scope of coverage afforded thereunder. To the extent that they could be read to support the argument that a subcontract agreement can render otherwise clear and unambiguous language in an insurance policy ambiguous, we flatly reject that proposition. It is well settled that the clear and unambiguous terms of a policy will be given their plain meaning. *Elson v. State Farm Fire & Casualty Co.*, 295 Ill. App. 3d 1, 6 (1998).

¶ 32    CSR alternatively argues that Pekin expressly incorporated the MSA into the CGL policy by making reference to "a written contract." This proposition lacks merit. In order to incorporate another document by reference, the reference must disclose the parties' intention to incorporate the document and make it part of the contract. *Clarendon America Insurance Co. v. 69 West Washington Management, LLC*, 374 Ill. App. 3d 580, 587 (2007). In this case, the CGL policy extends additional insured coverage to any "person or organization for whom you are performing operations, when you and such person or organization have agreed in a written contract *** that you must add that person or organization as an additional insured on a policy of liability insurance." By referencing the written subcontracts to which Zamastil may be a party, the CGL policy simply provides that the other contracting party, for which Zamastil is performing the

subcontractor work, must be added as an additional insured on the policy. Nowhere in the CGL policy, however, does Pekin refer specifically to the MSA. Also, nowhere does Pekin demonstrate an intention to incorporate the MSA for purposes of determining the terms of coverage. The mere reference to "a written contract," in the generic, should not be construed as a willingness by the insurer to incorporate, or acquiesce to, terms of a separate agreement—such as the MSA—that were not negotiated and agreed to by the insurer and its insured(s), particularly if such terms contradict or alter the scope of coverage under the policy.

¶ 33    *Clarendon* supports our conclusion that the CGL policy did not incorporate the MSA. In *Clarendon*, Aargus Security Systems, Inc. (Aargus) contracted with 69 West Washington Management, LLC (69 West) to provide security guard service to a commercial high-rise building. *Id.* at 582. Under the terms of the parties' contract, Aargus was required to procure a commercial general liability policy naming 69 West and Cook County as additional insureds. *Id.* Aargus was also required to " 'cause each subcontractor of any tier to purchase and maintain insurance as required from [Aargus] including the Additional Insureds.' " *Id.* Subsequently, Aargus and B.G.K Security Services, Inc. (BGK) entered into a contract to jointly provide security guard service at the subject building. *Id.* In their contract, they agreed that " '[a]ll insurance that may from time to time be required shall be obtained in such manner as the parties hereto agree.' " *Id.* at 583. BGK procured a commercial general liability policy from Clarendon America Insurance Co. (Clarendon). *Id.* The policy contained a " 'Blanket Additional Insured Endorsement,' " which amended the policy " 'to include as an insured any person or organization (called "additional insured") to whom you are obligated by valid written contract to provide such coverage.' " *Id.*

¶ 34    Aargus, BGK, 69 West, and Cook County were sued as a result of a fire at the subject building. *Id.* Each tendered its defense to Clarendon, which then filed suit seeking a declaration that the BGK policy did not include 69 West and Cook County as additional insureds. *Id.* at 584. The trial court granted summary judgment to 69 West and Cook County. *Id.* This court reversed and entered summary judgment in favor of Clarendon. *Id.* at 590. We declined to read the 69 West/Aargus contract in conjunction with the Aargus/BGK agreement so as to find that BGK had a contractual obligation to name 69 West and Cook County as additional insureds. *Id.* at 586. We found that the Aargus/BGK agreement did not expressly incorporate the parties' intention to be bound by the terms of the 69 West/Aargus contract. *Id.* at 587. In reaching our conclusion, "we recognize[d] that Illinois courts have read two contracts together when the 'two instruments were executed by the same contracting parties in the course of the same transaction and [they] must be considered together and construed with reference to one another because they are one contract' [citation]." *Id.* However, we did not find that principle applicable because the record showed that the agreements involved different parties and were executed in different transactions. *Id.*

¶ 35    Here, as in *Clarendon*, the CGL policy does not explicitly show that Pekin and Zamastil intended to incorporate the MSA into the policy. Moreover, the CGL policy and the MSA did not involve the same contracting parties and were not executed as part of the same transaction. Under the circumstances, there is no basis for reading the MSA and the CGL policy together to determine the scope of coverage afforded by the policy. Accordingly, we reject CSR's argument.

¶ 36    CSR points outs that, in *Bieda v. Carson International*, 278 Ill. App. 3d 510 (1996), this court construed an insurance policy and a lease together to determine the intent of the parties. However, in *Bieda*, there was never any dispute that the policy issued by the defendant insurer

14

incorporated the terms of the lease agreement. The question in *Bieda* was whether the lease agreement required the named insured to obtain primary insurance on behalf of the additional insured. *Id.* at 512. A provision of the policy that pertained to additional insured parties specifically stated, " 'Where the applicable written agreement requires the insured to provide liability insurance on a primary, excess, contingent, or any other basis, this policy will apply solely *on the basis required by such written agreement* and Item 4.' " (Emphasis added.) *Id.* at 511. This court observed that "the lease, incorporated into Liberty Mutual's insurance contract *** required [the lessee/named insured] to acquire insurance against 'all liabilities, judgments, costs, damages and expenses' and did not mention any other insurance policies." *Id.* at 513. We interpreted this language to mean that the lessee/named insured and the lessor/additional insured intended primary insurance coverage. *Id.* Unlike *Bieda*, the CGL policy did not explicitly incorporate the MSA. *Bieda* is therefore inapposite.

¶ 37     We conclude that the circuit court did not err in declining to consider the MSA in interpreting the clear and unambiguous language of the CGL policy.

¶ 38                              C. Duty to Defend

¶ 39     CSR contends that Pekin had a duty to defend it in the underlying Lake Action even if coverage was limited to vicarious liability. According to CSR, the circuit court should have read the allegations in the Lakes' amended complaint in conjunction with the terms of the MSA when determining whether there was a duty to defend. CSR maintains that the Lakes' amended complaint, read together with the MSA, "do[es] not preclude the possibility that liability could be imposed vicariously on CSR for the negligence of Zamastil," thus triggering the duty to defend. As authority for considering the MSA, CSR cites *Pulte* and *Illinois Emcasco Insurance Co. v. Waukegan Steel Sales Inc.*, 2013 IL App (1st) 120735.

¶ 40    Pekin responds that the court did not err in declining to consider the terms of the MSA. According to Pekin, only the allegations in the underlying complaint should be considered in determining whether a duty to defend is owed. Pekin argues that because the Lake Action solely alleges direct liability on the part of CSR, it did not trigger coverage under the CGL policy and, therefore, no duty to defend was owed.

¶ 41    Generally, when determining whether an insurer is obligated to defend its insured, we compare the allegations in the underlying complaint to the relevant provisions of the insurance policy. *Koloms*, 177 Ill. 2d at 479. If the facts alleged in the complaint could potentially fall within the language of the policy, we will find that the insurer has a duty to defend its insured. *Id.*

¶ 42    In some circumstances, the circuit court may also look beyond the underlying complaint to determine whether a duty to defend is owed. *Wilson*, 237 Ill. 2d at 459. In *Wilson*, the supreme court found that the circuit court erred in failing to consider a counterclaim filed by the insured when determining whether the insurer owed a duty to defend. *Id.* at 468. The insured was the subject of a lawsuit alleging assault, battery, intentional infliction of emotional distress, and negligence. *Id.* at 449-50. He filed a counterclaim asserting self-defense and also tendered the defense of the underlying suit to his insurer. *Id.* at 449, 451. Under the terms of his commercial general liability policy, he was not covered for bodily injury resulting from his own intentional conduct; however, the policy contained an exception for " ' "bodily injury" resulting from the use of reasonable force to protect persons or property.' " *Id.* at 451.

¶ 43    The insurer argued that "the duty to defend must be based solely upon the allegations of the underlying complaint" and that the court could not consider the insured's own pleading raising self-defense. *Id.* at 454. The supreme court disagreed, citing this court's decisions in

*American Economy Insurance Co. v. Holabird & Root*, 382 Ill. App. 3d 1017 (2008), and

*Fidelity & Casualty Co. of New York v. Envirodyne Engineers, Inc.*, 122 Ill. App. 3d 301 (1983).

*Wilson*, 237 Ill. 2d at 459. The supreme court found that these decisions established when a

circuit court may appropriately rely on evidence outside of the underlying complaint to

determine where there is a duty to defend. *Id.* at 462. As pertinent here, the supreme court

favorably cited the following remarks from *Envirodyne Engineers, Inc.*:

> " '[I]f an insurer opts to file a declaratory proceeding, we believe that it may
>
> properly challenge the existence of [the duty to defend] by offering
>
> evidence to prove that the insured's actions fell within the limitations of one
>
> of the policy's exclusions. [Citations.] The only time such evidence should
>
> not be permitted is when it tends to determine an issue crucial to the
>
> determination of the underlying lawsuit [citations] ***. If a crucial issue
>
> will not be determined, we see no reason why the party seeking a
>
> declaration of rights should not have the prerogative to present evidence
>
> that is accorded generally to a party during a motion for summary judgment
>
> in a declaratory proceeding. *To require the trial court to look solely to the*
>
> *complaint in the underlying action to determine coverage would make the*
>
> *declaratory proceeding little more than a useless exercise possessing no*
>
> *attendant benefit and would greatly diminish a declaratory action's purpose*
>
> *of settling and fixing the rights of the parties*.' " (Emphasis in original.) *Id.*
>
> at 461 (quoting *Envirodyne Engineers, Inc.*, 122 Ill. App. 3d at 304-05).

¶ 44    In *Pulte*, this court considered a subcontract in determining whether an insurer owed a

duty to defend. Pulte Home Corporation (Pulte) and Jim Kunde Construction, Inc. (Kunde) were

sued when an employee of Commonwealth Edison/Exelon fell into an unguarded sewer manhole in the backyard of a home under construction. *Pulte*, 404 Ill. App. 3d at 336-37. Under a policy issued to Kunde, Pulte was named an additional insured " 'only with respect to liability incurred solely as a result of some act or omission of the named insured and not for its own independent negligence or statutory violation.' " *Id.* at 338. Pulte tendered its defense to the insurer; however, the insurer denied the tender "on the grounds that the additional insured endorsement [did] not provide coverage for Pulte's own acts or omissions or those in which Pulte played a role." *Id.* The insurer filed a declaratory judgment action, asserting that it had no duty to defend Pulte for its negligence. *Id.* The circuit court granted summary judgment to Pulte, however. *Id.* at 339.

¶ 45     This court, in determining whether the insurer owed Pulte a duty to defend, stated that it would compare the complaint to the terms of Kunde's insurance policy, but also consider other relevant pleadings and documents, including the Pulte and Kunde contract. *Id.* at 341. Initially, we found that the allegations in the underlying complaint did not preclude the possibility that Pulte could be found liable solely based on Kunde's acts or omissions. *Id.* at 342. We noted that the plaintiff in the underlying action had admitted that he "anticipated contending at the time of trial that Pulte's liability in the underlying litigation is vicarious to or imputed from acts or omissions of Kunde." *Id.* Then, turning to the subcontractor agreement, we noted that Kunde agreed to defend and indemnify Pulte " 'unless such claims have been specifically determined by the trier of fact to be the sole negligence of Pulte.' " *Id.* at 344. We stated:

> "A finding as to whether Pulte was solely liable will not be made until after
> a trial has been held and a determination of liability has been made. As
> noted above, the complaint alleges that Kaiser was injured when he fell into
> an unguarded sewer manhole. Kunde Construction was the sewer

subcontractor, and therefore Kunde Construction could be found solely liable to Kaiser for his injuries. As a result, any liability attributed to Pulte would arise solely as a result of the acts or omissions of the named insured. Under such circumstances, Pulte would be an additional insured under the terms of the endorsement to the insurance policy." *Id.*

¶ 46 In *Waukegan Steel*, we similarly considered a subcontract agreement when determining whether an insurer owed a duty to defend. Waukegan Steel Sales, Inc. (Waukegan) was sued by an employee of its subcontractor, I-MAXX Metalworks, Inc. (I-MAXX), for injuries the employee sustained while working on a construction site. *Waukegan Steel Sales Inc.*, 2013 IL App (1st) 120735, ¶¶ 1, 4. Under I-MAXX's insurance policy, Waukegan was an additional insured " 'with respect to liability for "bodily injury," ' " but an exclusion limited its coverage to " 'vicarious liability that is a specific and direct result of [I-MAXX's] conduct.' " (Emphasis omitted.) *Id.* ¶ 5. Waukegan tendered its defense in the underlying suit to the insurer; however, the insurer denied the tender because of "the allegations of direct negligence on Waukegan's part." *Id.* ¶ 6. At some point, two other companies named in the underlying action filed third-party complaints against I-MAXX alleging that its acts or omissions were the cause of the plaintiff's injuries. *Id.* ¶ 7. The insurer sought a declaratory judgment that Waukegan was not covered based on the exclusion in the policy. *Id.* ¶ 6. The trial court granted summary judgment to Waukegan, finding that "a duty to defend could be derived from the third-party complaints *** since they alleged direct negligence on the part of I-MAXX." *Id.* ¶ 8.

¶ 47 Even though it was undisputed on appeal that a duty to defend was not created by the complaint alone, our analysis did not stop there. *Id.* ¶ 14. We considered the third-party complaints, in conjunction with the personal injury complaint, and found potential vicarious

liability on the part of Waukegan. *Id.* ¶ 23. We also considered the subcontract between Waukegan and I-MAXX, under which I-MAXX was solely responsible for the methods and safety of its employees on the jobsite, was required to obtain insurance naming Waukegan as an additional insured, and was required to indemnify Waukegan against all claims arising out of I-MAXX's work. *Id.* ¶ 25. Taking all of the relevant documents into consideration, we concluded that the trial court did not err in finding that the insurer had a duty to defend Waukegan. *Id.* ¶ 26. Ultimately, we could not say unequivocally that Waukegan could only be found directly liable for the plaintiff's injuries. *Id.*

¶ 48 We agree with CSR that, under *Wilson*, *Pulte*, and *Waukegan Steel*, this court may consider the MSA in determining whether Pekin owes a duty to defend. We therefore reject Pekin's reliance on *Pekin Insurance Co. v. United Parcel Service, Inc.*, 381 Ill. App. 3d 98 (2008), and *Pekin Insurance Co. v. Beu*, 376 Ill. App. 3d 294 (2007), which have been cited for the proposition that the duty to defend must be based solely on the allegations of the underlying complaint. Both *United Parcel Service* and *Beu* pre-date *Wilson* and, thus, do not carry the same precedential value as our more recent decisions in *Pulte* and *Waukegan Steel*. We ultimately find no obstacle to considering the MSA along with the CGL policy and the amended complaint in determining wither Pekin owed a duty to defend.

¶ 49 In the case before us, it is apparent that the amended complaint asserts a theory of direct liability against CSR. The mere fact that allegations of direct liability are included in the complaint, however, does not defeat CSR's claim that it could also potentially be held vicariously liable, in the personal injury action, for acts or omissions of Zamastil. If CSR could be held vicariously liable for Zamastil's alleged negligence, then CSR is entitled to a defense under the additional insured endorsement of the CGL policy.

¶ 50 Upon examination of the amended complaint, we find that it contains several allegations suggesting that CSR could, in fact, be subject to vicarious liability. At the heart of the amended complaint is the allegation that Lake, during his work as a Zamastil employee, did not have appropriate safety devices while working on the roof, in violation of OSHA regulations. The Lakes allege that CSR was negligent in that it, *inter alia*, "[a]llowed its subcontractors to not be competent in violation of OSHA regulations" and "[f]ailed to require the subcontractor Zamastil to comply with OSHA regulations." On the surface, the Lakes are alleging that CSR failed to properly supervise its subcontractor, Zamastil; at the core, however, they are alleging that Zamastil is the party that failed to be "competent" and failed to comply with OSHA regulations, leading to the accident in question. As in *Pulte*, we do not believe the allegations in the amended complaint preclude the possibility that CSR could be found liable solely as a result of the acts or omissions of Zamastil. *Pulte*, 404 Ill. App. 3d at 342. To the contrary, these allegations can be read as the grounds for a claim that Lake was injured as a result of the failure by *both* CSR and Zamastil to supply or provide him with the necessary safety equipment during his work on the roof. Although the elements of a negligence claim were not specifically alleged against Zamastil, the amended complaint suggests that Zamastil's acts or omissions were an underlying cause of Lake's injuries.

¶ 51 A review of the MSA confirms that that the parties sought to limit CSR's potential exposure to vicarious liability, thus ensuring that CSR was covered in the case of worksite accident such as occurred here. *Waukegan Steel Sales Inc.*, 2013 IL App (1st) 120735, ¶ 25. The MSA states that "[s]ubcontractor shall be responsible for supervising its own workers *** [and] following its own work procedures and methods." It also states that Zamastil is responsible for "abid[ing] by all Local, State, Federal, and company safety rules and regulations." As in *Pulte*

21

and *Waukegan Steel*, the MSA requires Zamastil to name CSR an additional insured under a commercial general liability policy, and an indemnification provision requires Zamastil to indemnify CSR against any claims for injuries arising out of Zamastil's negligent acts or omissions. Seeing as the amended complaint alleges a lack of adequate safety equipment in violation of OSHA, we find it at least *possible* that CSR could be found vicariously liable for Zamastil's failure to ensure compliance with OSHA regulations. Accordingly, we find that Pekin owed CSR a duty to defend under the additional insured endorsement of the CGL policy.

¶ 52    We have considered *Pekin Insurance Co. v. United Contractors Midwest, Inc.*, 2013 IL App (3d) 120803, cited by Pekin, and find it distinguishable from the case at bar. In *United Contractors Midwest*, an employee of Durdel & Sons Tree Service & Landscaping, Inc. (Durdel) was in the process of moving logs with machinery when he struck overhead power lines and was electrocuted. *Id*. ¶ 1. He filed suit against R.A. Cullinan & Son, Inc. (Cullinan), alleging negligence "in supervising, maintaining and/or providing warnings regarding live overhead power lines near [the] work site." *Id.* Under an insurance policy issued to Durdel, Cullinan was covered as an additional insured, but only " 'with respect to vicarious liability for "bodily injury" *** imputed from *** [Durdel] to the Additional Insured [Cullinan].' " *Id.* ¶ 8. Cullinan tendered its defense in the underlying action to the insurer; however, the insurer rejected its tender. *Id.* ¶ 7. The insurer filed a declaratory judgment action, and the parties filed cross-motion for summary judgment. *Id.* ¶ 15. The circuit court ruled in favor of Cullinan, finding that the insurer owed a duty to defend. *Id.* ¶ 17.

¶ 53    On appeal, this court found that the plaintiff in the underlying action had failed to identify a negligent act of Durdel that stemmed from the directives of Cullinan. *Id.* ¶ 27. We noted that "[t]he failure to specify a negligent act committed by Durdel not only fails to trigger coverage to

an additional insured in Durdel's insurance policy, but also defeats a theory of vicarious liability." *Id.* ¶ 28. That is because Cullinan, as a general contractor, was not subject to vicarious liability for its own acts. *Id.* We therefore concluded that the circuit court erred in granting summary judgment in favor of Cullinan. *Id.*

¶ 54     Unlike *United Contractor Midwest*, the amended complaint contains allegations suggesting potential negligence on the part of Zamastil: specifically, the Lakes allege that Zamastil failed to provide adequate safety gear in violation of OSHA regulations. We ultimately find Pekin's reliance on *United Contractor Midwest* misplaced.

¶ 55     Both Pekin and CSR devote a portion of their brief to the question of whether there could be vicarious liability under section 414 of the Restatement (Second) of Torts (Restatement (Second) of Torts § 414 (1965)). We decline to address the applicability of section 414, as we believe it may tend to determine an issue crucial to the determination of the underlying lawsuit. "Although Restatement section 414 is important in determining whether an independent contractor is vicariously liable, at this juncture, the question is not whether [CSR] is vicariously liable. Rather, the issue is whether [Pekin] has a duty to defend [CSR] because it could *potentially* be found vicariously liable for [Lake's] injuries." (Emphasis in original.) *Waukegan Steel Sales Inc.*, 2013 IL App (1st) 120735, ¶ 22. Because we find that the amended complaint contains allegations that could result in a finding that CSR is liable for Lake's injuries, solely on the basis of the acts or omissions of Zamastil, we conclude that the court erred in granting judgment on the pleadings in favor of Pekin.

¶ 56                               CONCLUSION

¶ 57     Accordingly, we reverse the order of the circuit court granting judgment on the pleadings

in favor of Pekin and remand for the court to enter judgment on the pleadings in favor of CSR.

¶ 58    Reversed and remanded with directions.